In re Charles WOODALL.

WEST–ARK OIL COMPANY, Plaintiff,

v.

Charles WOODALL, Defendant.

Bankruptcy No. 91–16382 S.
Adv. No. 92–6501.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

Oct. 7, 1992.

Jeffrey Thomas, Little Rock, Ark., for plaintiff.

Charles Padgham, Hot Springs, Ark., for debtor/defendant.

James Dowden, Little Rock, Ark., trustee.

MEMORANDUM OPINION

MARY D. SCOTT, Bankruptcy Judge.

THIS CAUSE is before the Court upon the trial of the complaint to determine dischargeability. The complaint states two short counts, both of which are core proceedings: the first requests that the debt be determined nondischargeable under section 523. Count II requests that the debtor be denied a discharge under section 727. At the beginning of trial, plaintiff withdrew its request that discharge be denied, and the trustee declined to pursue this count. The prayer for relief in the complaint also requests the debt be reduced to judgment. Such a non-core proceeding is not before the Court. See Manufacturers Hanover Trust Co. v. Marlar, 142 B.R. 304, 307 (Bankr.E.D.Ark.1992).

The debtor Charles Woodall ("Woodall") operated a Texaco station for the plaintiff West–Ark Oil Company. The contracts between West–Ark Oil Company ("West–Ark") consisted of (1) a Station Lease and Assignment and (2) a Contract of Sale. Under the lease, Woodall leased the particular premises for sale of Texaco products. The Contract of Sale provided for the purchase of Texaco products by debtor for sale at the Texaco station he operated.

The Contract of Sale provides for issuance of a credit card to Woodall. Accordingly, during a short period in the 1980's, Woodall held a Visa credit card issued through Union Bank. Specific rules and guidelines regarding usage of the card are set forth in the contract and attendant documents between West–Ark and the debtor. Under the terms of the credit card agreement, Woodall was to use the credit card only for purchases of fuel and other related products. Obtaining cash with the card was expressly prohibited.

The Visa card was cancelled by Union Bank in 1989 because Woodall did not

make the payments as required under the terms of the card. In 1989, First USA Bank acquired the Visa credit card portfolio of Union National Bank. At the time of this acquisition, First USA issued new account numbers to all cardholders, regardless of the status of the individual account, and Woodall received one. Woodall's delinquent account was ultimately charged off by First USA Bank as uncollectible. Sometime in 1990, however, First USA Bank inexplicably sent Woodall a new credit card under the account number assigned in 1989. Upon receipt of the card, Woodall began making charges on the card. They remain unpaid. The issue in this case is whether those charges were made fraudulently within the meaning of Bankruptcy Code section 523(a)(2)(A) and hence are nondischargeable.[1]

The plaintiff West–Ark[2] argues that the use of the credit card was fraudulent as indicated by the fact that Woodall used the card in violation of the terms of usage between West–Ark and Woodall. Woodall argues that he received no notice of cancellation of the card and that he used the card in good faith as evidenced by the fact that the bankruptcy was not filed for one year after the use of the card. Woodall further asserts that there is no showing of fraudulent intent because once he was advised to stop using the card, he did so.

Woodall's use of the card sent to him in 1990 was fraudulent within the meaning of section 523(a)(2)(A). Section 523 provides in pertinent part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

The manner in which he used the card indicates that he used it to obtain cash and that his use of the card was fraudulent. Woodall began using the card on September 1, 1990, and used it continuously through the end of December, when he was told to stop using the card or face prosecution. Nearly every one of the charges made over a three month period is for an even amount. Indeed, for the first four weeks of use, every charge was for an even dollar amount, with no change. The evidence showed the charges for gasoline were made faster than the pumps could physically operate: the amount of gas charged was in excess of that which could have been pumped. From these attempts to disguise the nature of the transactions, it is clear that Woodall was aware that he was not supposed to use the card to obtain cash. Despite the prohibition against such use, he nevertheless fraudulently used the card to obtain cash.

As operator of the Texaco station, it was simple for him to make the charge slip for purchase of gasoline or other products, and take cash in exchange for the charge. That Woodall obtained cash from the charge card is evidenced by his own statements and the manner in which the charges were made. In deposition, Woodall admitted that he obtained cash from the card:

No, they sent me a credit card. I just run it through the machine every day because I wasn't making any money, and I just run it through a little bit every day to get back on my feet because West–Ark kept me down five months without fixing my gas tanks that busted.

Deposition at 7 (Exhibit 28). At trial, Woodall first denied that he obtained cash from

---

1. There was no evidence that Woodall applied for the card to be reissued. Accordingly, there is no issue in this case as to whether the card was obtained by any fraudulent statement pursuant to 11 U.S.C. § 523(a)(2)(B). The issue in this case was whether Woodall's use of the card was fraudulent pursuant to section 523(a)(2)(A).

2. West–Ark is plaintiff in this case because it is the entity which bears the cost of the fraudulent charges. The Visa charge card is used like cash between Woodall, West–Ark, and Texaco. West–Ark receives a credit from Texaco when Texaco receives the charge slips. If, however, the credit card transaction is invalid, Texaco debits West–Ark.

the card, stating, paradoxically, that he used the card because "he needed the money." He asserted that he was actually charging fuel. In his next breath, he admitted that he used the card to get cash, to pay his rent.

Thus, Woodall's own statements, although contradictory, demonstrate that he used the card to obtain cash in violation of the terms of the card. His statements and demeanor also indicate the fraudulent intent in the use of the card. Woodall's statements, and particularly his tone of voice, indicate that he was displeased with West–Ark, Texaco, and his agreements relating to the operation of the Texaco station. For example, he petulantly asserted that he needed the money because the rent he was paying was too high. He also stated that he obtained cash "because West–Ark kept me down five months without fixing my gas tanks that busted." Woodall clearly felt aggrieved and, thus, felt no compunction or even hesitation in using the credit card in a fraudulent manner.

Woodall asserts that he intended to repay the charges. The Court does not believe this self-serving statement. Woodall asserts that he never received a bill for the charges he made over this three-month period. Woodall used the card in a manner he knew to be unauthorized and without any intent to repay the charges. While he asserts he intended to repay the charges, he admitted that he couldn't make the rental payments on the station. Woodall did not explain how he expected to repay the charges when he could not even keep the station operating without taking the cash to make his rental payments.

Woodall argues that there was no fraud because, once he was advised that the card was invalid, he stopped using the card. A representative of West–Ark personally called upon him to tell him he had been caught. He was threatened with a $5,000 fine if he did not cease his use of the credit card. These facts do not show a lack of fraudulent intent: they show he knew he had been caught. Ceasing unlawful activity once caught is not indicative of lawful intent. Woodall's demeanor, statements, and manner of operating indicate to this Court not only that Woodall's use of the card was fraudulent, but that he intended the fraud.

ORDERED that the debt owed by the debtor Charles Woodall d/b/a Charles Woodall Service Station in the amount of $3,806.74, relating to the procurement of cash by use of the Visa card account No. 4417 1164 0601 0143 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

IT IS SO ORDERED.